16229

BUFF v. COLUMBIA BAKING CO. *ET AL.*

(53 S. E. (2d) 879)

*Messrs. Norbert A. Theodore, Henry H. Edens and Henry Hammer,* all of Columbia, *for Appellant,*

*Mr. Joseph L. Nettles,* of Columbia, *for Respondents,*

June 10, 1949.

Taylor, Justice.

This is an action for benefits under the Workmen's Compensation Act, Code 1942, § 7035-1 *et seq.,* instituted by Mary Allie Buff as the widow of Sexton Jerome Buff, the deceased employee, against Columbia Baking Company, employer, and American Mutual Liability Insurance Co., the insurance carrier, it being contended that the death of Sexton Jerome Buff was due to an accident arising out of and in the course of his employment on the 21st day of October, 1946. Both the employer and carrier denying liability, hearings were had before Commissioner W. L. DePass, Jr., who rendered an award dated February 14, 1947, in favor of the claimant. Appeal was duly taken therefrom to the full commission, which issued its opinion and award dated April 9, 1947, affirming the hearing commissioner. Thereafter an appeal was duly taken to the Court of Common Pleas for Richland County and heard by the Honorable M. M. Mann, presiding judge, who on the 19th day of January, 1948, passed an order reversing and setting aside the award. Within due time appeal was taken to this court and now comes before us on exceptions which in our opinion raise the single question of whether or not there is sufficient evidence to support the findings of the fact-finding body that the deceased died as a result of an accident arising out of and in the course of his employment.

"In reviewing this case on appeal, this Court is of course cognizant of the well founded rule of law that the Industrial Commission being the fact-finding body

and this Court and the Circuit Court both being appellate Courts in workmen's compensation matters, this and the Circuit Courts can only review the facts to determine whether or not there is any competent evidence to support the findings of the fact-finding body. If there is, the Courts are without power to pass upon the force and effect of such evidence. An award may of course be reversed if there is an absence of any competent evidence to support it, but in Workmen's Compensation cases the Courts are not the triers of facts. If the facts proved are capable as a matter of law of sustaining the inferences of fact drawn from them by the Industrial Commission its findings are conclusive in the absence of fraud and neither this Court nor the Court of Common Pleas is at liberty to interfere with them. *Anderson v. Campbell Tile Co.*, 202 S. C. 54, 24 S. E. (2d) 104; *Crawford et al. v. Town of Winnsboro et al.*, 205 S. C. 72, 30 S. E. (2d) 841; *Lanford v. Clinton Cotton Mills*, 204 S. C. 423, 30 S. E. (2d) 36; *Strawhorn v. J. A. Chapman Const. Co.*, 202 S. C. 43, 24 S. E. (2d) 116; *Cokeley v. Robert Lee, Inc.*, 197 S. C. 157, 14 S. E. (2d) 889; *Shehane v. Springs Cotton Mills*, 206 S. C. 334, 34 S. E. (2d) 180." *Green v. Grinnell Co.*, 213 S. C. 116, 48 S. E. (2d) 644, 647.

The deceased was employed on the date of his death, October 21, 1946, by the Columbia Baking Company and was at that time engaged in the operation of a machine called a divider. On the afternoon of this date, Buff was found in an unconscious state lying in front of the dividing machine where he was working. To the left of it was a hoist consisting of a steel frame about four feet wide, six to eight feet long and approximately fifteen feet high. To the right of and attached to this frame was a feeding vat, the opening and closing of which was controlled by a steel wheel resembling the steering wheel of a car. At the top of the hoist was an electrical motor operating under a 550 to 575 volt current with a capacity of 30 amperes. This motor was attached to the frame of the hoist and that in turn to the vat or hopper to which the steel control wheel was attached. The motor

was controlled by a double switch, which in turn was controlled by a length of chain on either side. One chain when pulled would carry the conveyor, which was used to hoist dough to the vat, up and the other, when pulled, would cause it to descend. If no pressure was exerted on either of the chains the switch remained in a neutral position automatically stopping the motor. At the time the employee was found in front of the machine the conveyor with a load of dough was approximately halfway up the hoist. Mr. Perry, another employee, was ordered to take over the operation of the machine who, upon finding the vat halfway up the hoist and not knowing whether it was a full vat on the way up or an empty one on the way down, pulled the "down" chain running the vat down to a position where he could see over the side. Upon perceiving that it was full of dough he in turn pulled the "up" chain lifting the vat and dumping its dough into the hopper where it was processed through the divider without incident. Approximately twenty minutes later when another vat of dough arrived at the divider, Perry pulled the down chain to the hoist motor which lowered the empty vat, the motor started but before reaching the floor stopped and failed to operate; whereupon he called for Mr. Dye, the maintenance man. It being desirous of processing the newly arrived vat of dough, Perry began loading the hopper of the divider by hand, the maintenance man at the same time trying to find the trouble with the hoist motor. While placing the moist dough into the divider, Mr. Perry touched his forearm against the hopper control wheel; whereupon he received an electrical shock which burned his forearm and knocked him forcibly from the machine at which time the fuse to the hoist motor apparently burned out.

It is well settled that circumstantial evidence may be relied upon to settle questions of fact in workmen's compensation cases as in other cases, see Horovitz on Workmen's Compensation 151; *Ferguson v. State Highway Department,* 197 S. C. 520, 15 S. E. (2d) 775; *Holly v.*

*Spartan Grain & Mill,* 210 S. C. 183, 42 S. E. (2d) 59; and in 71 C. J. 1085-86 we find the following:

"Circumstantial evidence may be sufficient to support a finding of fact or an award, and a finding or award may be based on inferences drawn from circumstantial evidence; the evidence need not, although it may, be direct or positive. Circumstantial evidence, to establish a claim, need not reach such a degree of certainty as to exclude every reasonable or possible conclusion other than that reached."

In *Owens v. Ocean Forest Club,* 196 S. C. 97, 12 S. E. (2d) 839, 841, this Court quoted with approval from 71 C. J. 1060 to the effect that:

"There is a natural presumption, or a presumption of fact, that one charged with the performance of a duty and injured while performing such duty, or found injured at a place where his duty may have required him to be, is injured in the course of, and as a consequence of, the employment."

The Circuit Judge, in reversing the award, relied principally upon the testimony of the witness Dye to the effect that if a burned wire did exist in the motor it would continue to run until stopped but would not start again and since the motor did start after the deceased was found lying by the machine this condition did not exist. The testimony of the witness Dye relative to this question appears as follows:

"Q. Now go back to the motor, if this wire burned out, would that motor run again * * * would it keep running? A. No, sir. It would run while it was in motion, but after it stopped, it wouldn't start again.

"Q. It couldn't start again? A. It couldn't start again. As long as it was in motion, it would run, but you can't start it again.

"Q. So that, if that motor ran, after Mr. Buff was found lying there, you couldn't have had this burnt wire in there? A. No, sir; because it would have stopped.

"Q. It would have stopped."

However, the witness Dye, who is not an expert, apparently made conflicting statements as to the condition of the motor as on one occasion he said he found a ground in the motor and on another he said he found the wire burned in two. Witness H. K. Walker, an electrical engineer, testifying relative to the apparently conflicting statements of the witness Dye testified as follows:

"Q. Well, let me ask you this before you answer that: The other day did you hear the testimony as to the condition they found in the motor, and that they took the motor off and put it to one side? A. I heard what appeared to me to be some conflicting testimony. It was either that, or else it was two different cases of trouble. As I recall it, one gentleman said that, when this accident happened, they found the motor grounded, and then another time it was stated that the motor wouldn't run, which would indicate that there must have been a short, or a condition of the ground. Whether it was at that state or not, I 'wasn't clear on that, but you might straighten me out on that."

"Q. Mr. Walker, going back to the way that machine was found, after the man was found lying on the floor, if someone had gone on, or if someone went on and operated that machinery in the normal manner and felt no shock until sometime later on when the person handling wet dough which was further grounded to another machine, and with his hand in the dough, came in contact with this wheel, and he received a shock. Up. until that time * * * Well let's assume that up until that time the person operating the machine in the normal manner received no shock. Would that indicate to you that there was no—I believe I'm confused over the short and ground—would that indicate to you that the machinery was not charged so that a person would be injured in touching it? A. Not necessarily. That quite frequently is the case, when trouble develops in pieces of electrical machinery, that it would occur for the instant and clear itself and occur again, and continually until

it breaks down, which seems to have been the case with this motor."

"Q. I believe it was testified here that the fuse did not blow until some time after this man was found on the floor. Were you here when they were talking about that? A. I think so, yes.

"Q. Does that indicate to you, or would it have any bearing in your mind on whether or not the framework was, in fact, charged with electricity? A. Well, as I said before, the ground is the only thing which could have charged the frame of that machine, and that it would not have any bearing on the operation of the motor but it would be very easy to believe that, if a ground had occurred, more trouble would develop fairly soon."

Autopsies were performed and revealed no pathology, all the medical testimony being that deceased was a young man in good health and there was no evidence to indicate the cause of deceased's death.

Dr. H. H. Plowden testified as follows:

"Q. Were you examining in an effort to find evidence or not, of electrocution? A. Yes. It had been suggested to me that the man probjably had been electrocuted, and this bruise and other tissues of the body were examined with the idea in mind that he may have been electrocuted.

"Q. Doctor, what were the evidences that you were looking for? A. I was looking for burns on the surface of the body, and hemorrhage in the brain and other tissues of the body.

"Q. Did you find any? A. I did not.

"Q. Did you then discard the possibility of electrocution as the cause of death? A. I can't say yes to that question for the simple reason that I found nothing which would explain his death from any cause.

"Q. You found no evidence that there was any death from electrocution? A. No, sir; I did not.

"Q. Doctor, in the course of your experience, are the signs which you have just said you looked for, usually present in a death from electrocution? A. Yes, sir.

"Q. Would you say that they were always present in that case? A. I can't say they are always present. It depends on the conditions, and further, I haven't had an extremely wide' experience in doing Post Mortem, or experience in deaths from electrocution. Consequently, I couldn't fully answer it yes.

"Q. Doctor, in your opinion, would you say it's more likely or not that this man did die from electrocution? A. Well, sir, I can guess just like anyone, and if I answer it yes or no, it would be strictly a guess.

"Q. In other words, you found no evidence of anything causing the death by electrocution, or anything else? A. That's correct."

Dr. Fort who helped perform the autopsies testified as follows:

"Q. Did you perform an autopsy on Mr. Buff? A. Doctor Brannon did, and I helped him.

"Q. You assisted Doctor Brannon? A. Yes.

"Q. When an autopsy is performed upon a deceased person, and there is no external evidence of the cause of the death, what is the first thing that you look for, in seeking to determine the cause of death? A. We examine the heart and the brain to see if there is any pathology.

"Q. Doctor Fort, why do you look first to the heart and to the brain? A. They are the common sites of pathology in persons that die, and there is no explanation and no other causes.

"Q. Did you find any pathology in the heart of Mr. Buff? A. No, sir.

"Q. Did you find any pathology of the brain? A. No, sir.

"Q. Did you find any pathology internally that would account for his death? A. No, sir.

"Q. What are the possibilities when you find no internal evidence or pathology of death? As a member of the medical profession, how do you account for the death? What other outside influences do you consider? A. Trauma of some nature is one of the possibilities when we found no internal causes to explain.

"Q. And if the answer is trauma with other elements, do you consider the circumstances surrounding his death * * * what other considerations do you take into consideration? A. Well, we try to go by the history to see if there is any suggestions of any outside force that could have caused it.

"Q. What are some of the other outside forces that could cause death that would not necessarily leave any evidence of trauma? A. Well gases, electricity and those types of things * * * we find no other evidence of it.

"Q. Would strangulation or suffocation be one of those? A. I think he could not be suffocated and not leave some external evidence of it.

"Q. Now, with respect to electricity or electrical shock, would a shock sufficient to produce death necessarily show any pathology? A. I don't think there is anything absolutely sure of it.

"Q. Have you made any studies along those lines? A. I read some reports on it to find out if it was so, and this is the opinions of the authorities that I have consulted about it.

"Q. And that's to the effect that an electric shock sufficient to produce death does not necessarily show any pathology? A. Yes, sir."

Dr. L. J. Brannon testified that he found no pathology and refused to assign any cause for death.

"Where medical testimony is relied upon to sustain an award of the Industrial Commission it is not sufficient to say that the condition of claimant could possibly have arisen or it would be possible to have resulted from the injury. This court has gone so far as to hold in

cases where medical testimony is relied upon that testimony to the effect that it is the witness opinion that such ailment *most probably* came from the cause alleged was sufficient to sustain an award by the Industrial Commission. *Ashley v. South Carolina Highway Dept.,* 213 S. C. 354, 49 S. E. (2d) 505; *Mack v. Branch No. 12 Post Exchange,* 207 S. C. 258, 35 S. E. (2d) 838; *Rivers v. V. P. Loftis Co. et al.,* 214 S. C. 162, 51 S. E. (2d) 510."

Here, however, medical testimony alone is not relied upon as a careful analysis of the evidence discloses that deceased was found in a dying condition where his duty required him to be, that immediately prior thereto he was operating the machine which subsequently was found to be charged with electricity to such an extent that another employee was knocked forcibly from this machine, that the motor operating the hoist and attached to the frame was defective causing the machine to be charged with electricity, that the amount of current one would encounter upon receiving a shock therefrom would vary from zero to 550 volts with 30 amperes which is sufficient to cause death. Expert testimony was that such a ground would charge the machine which would continue to operate until further trouble developed. Medical testimony that only one per cent of autopsy cases fail to show pathology and in this case no pathology was revealed and further that in case of death by electrocution, pathology is not necessarily shown.

Unwitnessed deaths have posed grave problems for many learned judges. The distinction between reasonable inferences (which are compensable) and speculation, conjecture and surmise (non compensable), often baffle the wisest. The courts however, usually abide by the decision of the fact-finding body unless it can be said that taking all the factors into account it drew an inference that no reasonable man could draw. See *Owens v. Ocean Forest Club, supra; Ferguson v. State Highway Department, supra;* and Horovitz on Workmen's Compensation, 133-134.

This matter has given this Court grave concern. However, after careful study, we are constrained to hold that the evidence adduced and the inferences which may reasonably be drawn therefrom are sufficient to support the findings of the fact-finding body. It is, therefore, the opinion of this court that the order and judgment of the Circuit Court should be reversed and the award of the Industrial Commission affirmed, and it is so ordered.

Judgment reversed.

FISHBURNE, STUKES, and OXNER, JJ., and STEVE C. GRIFFITH, A. A. J., concur.