18090

Dorothy R. GLENN, Widow and Guardian *Ad Litem* for Janice Kay Glenn and David W. Glenn, Respondents, v. DUNEAN MILLS and Liberty Mutual Insurance Company, Appellants.

(131 S. E. (2d) 696)

536

*Messrs. Haynsworth, Perry, Bryant, Marion & Johnstone,*
of Greenville, *for* *Appellants,*

*Messrs. Bolt & Bowen,* of Greenville, *for Respondents,*

July 3, 1963.

BUSSEY, Justice.

This is an appeal in a Workmen's Compensation case from an order of the circuit court affirming an award of benefits by the South Carolina Industrial Commission for the death of Carl Glenn, an employee of Dunean Mills.

Aside from an exception to the order of the circuit judge settling the case on appeal, the only question before us is whether the record contains any competent evidence reasonably tending to support the finding of fact by the Industrial Commission that the death of the employee resulted proximately from accidental injury arising out of and in the course of his employment. In the consideration of this question, it is well established that we have to view the evidence in the light most favorable to the claimants.

The deceased employee, aged 51, and in excellent health prior thereto, on July 2, 1961, while at work for the employer repairing an air conditioning unit, became ill and died shortly thereafter. There was offered no autopsy report, death certificate or testimony of an attending physician to establish or explain the probable cause of death.

The employee had been employed by the employer for twenty-five to thirty years, and for several years had been

foreman of the air conditioning department. On the date in question he reported to work at 8 A. M., to work on an air conditioning unit which had developed a leak, thereby permitting water and a gas known as "Freon 11" to mix in the air conditioning unit. When filled, the unit required thirty-six hundred pounds of Freon 11 gas (manufatured by E. I. DuPont de Nemours & Company, Incorporated of Wilmington, Delaware).

Present and working on this occasion were Mr. Robert E. Perry, who was master mechanic for the employer and decedent's immediate superior, several other employees and a factory representative from the air conditioning firm that installed the unit. A portion of the mixture of Freon gas and water had been drained from the air conditioning unit the day before onto the floor. The room in which the air conditioning unit was located was thirty-six feet wide, fifty-three feet long, and nineteen feet six inches high. It had two double doors which, when open, were eight feet high and eight feet wide, and two ventilator openings in one wall, each measuring two feet by two and a half feet.

The decedent and others present worked in and about the unit most of the day and during the afternoon, in the process of preparing to force the balance of the mixture of water and Freon gas from the machine, a large piece of plywood board was placed in the space between two connecting large pipes, which were approximately ten inches in diameter. This blocked circulation beyond the point and acted as a splatter board. It apparently was necessary to force the remainder of the mixed solution from the machine by switching on a motor, which operated a high velocity compressor, and when the motor was switched on by the deceased employee the mixture of gas and water burst out of the machine with considerable force and splattered over a large portion of the air conditioning room, thereby causing a heavy mist or fog in the room.

The vapor thus created had an obnoxious odor and all of the employees had to leave the room due to the various

sensations they experienced from the gas. The effects and sensations were variously described as making them feel "woozy", "giddy headed", "drunk", "dizzy", "weak legged", and a "tight feeling in the chest". The employees went into the yard to escape the effects of the gas, where they remained for approximately ten minutes, during which time there was considerable discussion of the effects of the gas. Thereafter, the deceased employee and one or more of his co-workers re-entered the air conditioning room where the decedent again pulled the switch and started the motor, which ran for about a minute, forcing more of the mixture from the machine, after which they again left for a few minutes.

The decedent then returned to the room along with one or more of his co-workers and started the motor for a third time. This occurred at approximately 4:30 P. M. The co-workers noticed that the deceased employee was experiencing some difficulty, his condition being described as having a puzzled look on his face; his legs appeared to buckle under him; the color in his face changed; his eyes seemed to bulge and he was having difficulty in breathing. He was immediately taken outside of the plant by his co-workers and one of them placed decedent on his stomach and applied artificial respiration, but decedent did not appear to respond, whereupon an ambulance was summoned and decedent was rushed to the emergency room at the hospital where he was shortly pronounced dead.

The widow testified that she first learned of the events that had transpired when she received a telephone call from Mr. Perry, the master mechanic, who told her over the telephone, "We have had an accident and Carl (Glenn) has gotten an overdose of Freon. * * * We don't how serious it is, we have called an ambulance and will you get a doctor to meet us over there and come over yourself." The foregoing statement was neither denied or explained by Perry who was one of the two witnesses who testified for the appellants.

The respondents offered in evidence, without objection, a publication distributed by "The 'Freon' Products Division

of E. I. DuPont de Nemours & Company", entitled "DuPont 'Freon' Technical Bulletin", with the subtitle of "The 'Freon' Compounds and Safety". The record refers to the date of this publication as being November 1959, but the actual exhibit filed with this court indicates that it was at least republished in April 1961.

This publication contains considerable data with respect to the various Freon gases, manufactured by DuPont. It is fairly inferable from this publication that all Freon gases are toxic and it is clear that of the six Freon gases listed, only "Freon 113" is somewhat more toxic than "Freon 11". The publication further supports the inference that exposure for a sufficient length of time to gases or vapors in which there is a sufficient concentration of "Freon 11" can have a lethal effect. The publication contains a table showing a classification of comparative life hazards of gases and vapors in which all of the Freon compounds are listed in comparison with various other inert gases and immediately following the table is the following language:

"The principal hazard with inert gases is that the supply of oxygen may be reduced below the point necessary for supporting life. If the oxygen is displaced by the inert gas suffocation will occur."

Appellants contend not only that the evidence was insufficient to support an inference that the employee's death resulted from his exposure to Freon gas, but that the evidence of an expert witness shows conclusively that it did not so result. The only witness to testify for the appellant other than Mr. Perry, was a Dr. John Fougler, of Wilmington, Delaware, a learned toxicologist who had been employed by E. I. DuPont de Nemours & Company, Incorporated for many years. A review of the testimony of Dr. Fougler shows that all of his testimony was keyed primarily to the following hypothetical question and answer:

"Q. Now, doctor, in a room 53 feet long, 36 feet wide, with nineteen and a half foot ceiling, there was a opening for double doors, both of which double doors were open, now

making the opening eight feet high, and eight feet wide, and two ventilator openings in one wall, each measuring two feet by two and a half feet, if thirty-five pounds of Freon in a liquid state were suddenly released with force within that room into a state of vapor, state whether or not a person within such room at the time could die therefrom?

"A. He could not."

In our view, the testimony of the learned doctor was ■ of little probative value for several reasons. The hypothetical question does not take into consideration decedent's repeated exposure to the gas, or the type of Freon involved. The question assumed that the doors were open, whereas the witness Perry testified that he opened the doors after decedent's first exposure to the gas. There is no positive evidence as to thirty-five pounds or any other definite poundage of Freon in a liquid state being released, and the question is not predicated upon any percentage of concentration of Freon vapor in the air. Freon in a vaporous state, according to the evidence, occupies "many, many times the space" occupied by Freon in a liquid state.

Mr. Perry testified that, in his opinion, the amount of mixture of water and Freon in a liquid state remaining in the machine would have been less than thirty gallons, and that the weight thereof would have beeen less than four hundred pounds. He further testified that in his opinion liquid Freon constituted no more than five per cent, by volume, of the combined mixture, but would not venture an opinion as to the weight of the Freon since, admittedly it was difficult to calculate due to the difference between the specific gravity of water and Freon.

On cross-examination, the doctor testified that a concentration of Freon (in the atmosphere) in the order of two to four per cent could cause wooziness; that a concentration of ten per cent Freon vapor in the atmosphere would produce sufficient anesthesia for a surgical operation, and that while such a ten per cent concentration would produce nothing more than anesthesia, a person could inhale Freon in suffi-

ciently concentrated form to displace the oxygen in the lungs. He expressed no opinion as to the percentage of concentration necessary to produce this latter result.

There was no evidence as to the percentage of concentration of Freon vapor in the air at the time or times when the decedent was exposed. Since the difference in the specific gravity of water and liquid Freon does not appear, it is at least questionable as to whether it is even inferable from the opinion testimony of Mr. Perry that there was thirty-five pounds or less of liquid Freon in the machine. Nevertheless, in response to a question by the hearing Commissioner, Dr. Fougler testified that the forceful expulsion of thirty-five pounds of Freon gas mixed with thirty gallons of water would not contaminate or pollute or create anything deleterious in the atmosphere. If his opinion is this respect be correct, it would seem to follow as a most logical inference that Mr. Perry's opinion as to the amount of liquid Freon present was erroneous, since it is undisputed that various ill effects were suffered by other employees, and there is no explanation of these ill effects, other than exposure to a heavy concentration of Freon gas.

The probative value of expert testimony, based upon hypothetical facts, stands or falls with the existence or non-existence of the facts upon which it is predicated. *McCarty v. Kendall Co.,* 238 S. C. 493, 120 S. E. (2d) 860. Here, the hypothetical question which was the basis of the doctor's testimony lacked anything like a complete or accurate hypothesis supported by proof. Moreover, the only evidence as to the amount of Freon gas present, even in liquid form, is contained in the opinion testimony of Mr. Perry. An expert witness is not allowed to base his opinion upon the opinion of another. *Hines v. Pacific Mills,* 214 S. C. 125, 51 S. E. (2d) 383; *Ellis v. Kansas City Life Ins. Co.,* 187 S. C. 334, 197 S. E. 398.

It is well settled that circumstantial evidence may be sufficient to support a finding of fact and award in Workmen's Compensation cases. As was said in the

recent case of *Grice v. Dickerson, Inc.,* 241 S. C. 225, 127 S. E. (2d) 722:

"Such evidence, to support a finding of fact, need not reach such a degree of certainty as to exclude every reasonable or possible conclusion other than that reached by the Commission. It is sufficient if the facts and circumstances proved give rise to a reasonable inference that there was a causal connection between claimant's present disability and his prior injury and surgical operation. *Buff v. Columbia Baking Co.,* 215 S. C. 41, 53 S. E. (2d) 879."

In the *Buff* case, just above cited, the facts were similar to the present case in that there was no positive medical testimony one way or the other as to the cause of death of the employee. The employee there came to his death in the course of his employment and an award for death benefits was affirmed on the theory that the employee's death was caused by electrocution, the evidence showing such a possibility and there being no other explanation of the employee's death.

In the instant case we have a man in good health who came to his death, in the course of his employment, following an exposure to a concentration of Freon gas, there being no explanation of his death unless it was caused by such exposure. Under such circumstances, it became the duty of the Commission to weigh all of the facts in the light of the possibilities established by the scientific evidence. Here, as in the *Grice* case *supra,* the expert or scientific evidence, which was of any probative value, did not negate the cause of death as found by the Commission. To the contrary, it confirmed the possibility of such cause. Under all of the circumstances, we conclude that there was ample, competent evidence to support the finding of the Commission that the death of the employee proximately resulted from an exposure to a heavy concentration of Freon gas.

The only other question before us is whether there was any error on the part of the circuit judge in including in the statement of the case, over the objection of the appellants, the following:

544

"On July 2, 1961, the deceased, Carl Glenn, who was a supervisor in the maintenance department of Dunean Mills, was exposed to an *overdose* of Freon gas and became ill while certain maintenance was being done on an air conditioning unit and died a short time thereafter. (Emphasis added.)"

Appellants' objection to the foregoing language is solely to the word "overdose". It is true that the appellants did not formally admit that the employee was exposed to an "overdose", but the wife of the deceased employee testified that she was so informed by Mr. Perry, the master mechanic, and her testimony in this respect was neither denied nor explained. Therefore, even if the inclusion of the word, "overdose" in the statement of the case was not technically correct, it was harmless.

Affirmed.

. Taylor, C. J., and Moss, Lewis and Brailsford, JJ., concur.