15493

ANDERSON *ET AL.* v. CAMPBELL TILE CO.

(24 S. E. (2d), 104)

56

 Sep-
tember, 1942. 

*Mr. Stephen Nettles,* of Greenville, Counsel for Appel-
lants,

*Messrs. Culbertson & Brown,* of Greenville, Counsel for
Respondents,

January 22, 1943.

The Opinion of the Court was delivered by MR. CHIEF
JUSTICE BONHAM.

James Clark, the decedent, an employee of the appellant,
Campbell Tile Company, suffered an accident in the course
of his employment on June 13, 1941, while he was assisting

some others in lifting a heavy terrazzo machine from the truck of their employer, at which time more than his share of the load was thrown on him, resulting in a strain. After the accident he was unable to work, and was shortly thereafter carried to his home, where he remained ill for about ten days, after which time he was taken to the hospital where he died on July 9, 1941.

The respondents, brother and sister of the decedent, instituted proceedings before the Industrial Commission under the Workmen's Compensation Act, Code 1942, § 6851 *et seq.*, following which hearings were had before the single commissioner who, after hearing considerable medical testimony, and other testimony, filed an opinion and award in favor of the claimants-respondents, finding as a fact, among other things: "That as a direct and proximate result of the accidental injury of June 13, 1941, James Clark died on July 9. 1941 from myocarditis and toxemia brought on from extravasation of urine which extravasation resulted from strain, while James Clark had a stricture in his urinary system."

Upon a review of the award, which was had at the instance of the defendants, the majority of the full commission affirmed the award of the single commissioner who, it found, had not "committed error in his findings of fact, his statement of his case, his conclusions of law, nor has he committed error in making favorable award in favor of the claimant in the instant case and, basing it entirely on the testimony which has been analyzed by the commissioners," filed its award on May 15, 1942.

Thereafter the defendants appealed to the Court of Common Pleas for Greenville County, whereupon the appeal was heard by the Honorable G. Dewey Oxner, resident Judge of that county and of the community in which the proceedings came on for review. Following the hearing of the appeal, an order was filed by the presiding Judge affirming the award of the majority of the Industrial Commission The order, in part, was in the following language:

"There is testimony tending to show that the deceased, James Clark, suffered an accident in the course of his employment, on June 13, 1941, while assisting in the lifting of a heavy iron machine. This accident a strain. * * *

"The only ground of appeal is to the effect that the evidence discloses no casual connection between the accident and the death of the said James Clark.

* * * * *

"The only inquiry before this Court is whether there was any evidence to support this finding of fact (by the Industrial Commission) ; the sufficiency of the evidence being a matter solely for the determination of the commission.

"After careful examination of this record, I am of opinion that there was evidence, if believed by the commission, which would justify its findings.

"There is a sharp conflict in the testimony of the two experts, Dr. Nacham and Dr. Wyman. Dr. Wyman, after reading all testimony bearing on the nature of the injuries and the physical findings and symptoms disclosed by the medical testimony and autopsy, concluded that extravasation of the urine was the primary cause of the death of the deceased and that this extravasation was caused by the strain suffered on June 13, 1941.

"Counsel for the defendants vigorously urge that this conclusion is without probative value because the record affirmatively shows that there was no extravasation of the urine in this case. Dr. Nachman was of the opinion that there was no extravasation of the urine. However, Dr. Wyman, after considering all the symptoms disclosed by the medical testimony and the autopsy, reached a different conclusion.

"The following extracts are taken from the testimony of Dr. Wyman:

" 'Q. Now, if he had an extravasation of his urinary tract there, do you not think that the pathologist would have noted it on his report? A. He didn't dissect his urethra, he

just opened his bladder. He said his bladder was terribly involved, and pus was right on the outside of his bladder. That is a clear picture of extravasation of urine written right by that pathologist.

\* \* \* \*

" 'Q. To what extent would one have to strain himself to cause what you have assumed was the condition of this claimant here, the rupture? A. Mighty little.'

"The fact that Dr. Wyman did not personally examine the patient might go to the weight of his testimony, but would not destroy its probative value. It was entirely a matter for the commission to determine as to whether the theory of Dr. Nachman or that of Dr. Wyman should be accepted."

From the foregoing order, and the judgment thereon, the appellants appealed to this Court upon the sole exception that: "The trial Judge erred in not holding that the only proper conclusion from the evidence was that there was a failure of proof of any causal connection between the accident and the death of James Clark, and consequently that the claimants could not recover."

The appellants, in their brief, admit that the accident which has been referred to herein occurred in the course of the employment of the decedent with his employer. They further admit that a strain resulted from the unequal share of the load being thrown on the deceased when he and others lifted the heavy machine on that occasion. Therefore, the sole question to be determined by this Court is whether there was any relevant, competent evidence to support the finding that there was a causal connection between the strain to which the decedent was subjected, and his death less than four weeks later.

The deceased, a Negro man thirty-three years of age, appears to have performed, and been able to perform, heavy manual labor regardless of the fact that he was suffering from a gonorrheal infection at the ime of his injury. The medical testimony is conflicting as to the length of time during which the decedent had had this disease prior to his

injury. Dr. H. P. Bailey, a witness for the defendants, testified that shortly after the injury the decedent gave him a case history of having contracted gonorrhea four or five years previously, while other testimony indicated a more brief duration. In either event, when Dr. Bailey was asked on cross examination: "Doctor, if a man had a gonorrheal infection and condition, and received such a jerk as that, from lifting, it could complicate, or aggravate that gonorrhea?", his answer was in the affirmative.

The appeal in the case centers largely around the testimony of Dr. Marion Wyman, a witness for the claimants, who was admitted to be an expert urologist. Dr. Wyman had not seen the decedent, but had read the medical testimony in the case, and, the material facts of the illness not being in dispute, gave, without objection, his opinion as to the cause of death, based upon the medical testimony, and upon hypothetical questions, and upon his knowledge as an expert, in the following instances, among others:

"I think this autopsy report, Mr. Commissioner, will definitely bear out the opinion that I had before I came up. * * * I concluded from the history, and what they found there, plus his autopsy findings, that he had a leak of his urine from his normal urinary tract which infected this tissue. I don't know any other complications of gonorrhea that will cause that picture. I honestly don't; except a rupture of the urinary tract.

"Q. What would cause a rupture of the urinary tract? Would a strain cause it? A. Yes, sir; definitely is the cause of it. * * * Extravasation is a very killing thing; which means the spilling of the urine out of the normal tract into the surrounding tissue.

\* . \* \* \*

"Q. If a person having an old case of gonorrhea received a strain and died within three or four weeks thereafter, with all the complications indicated by the autopsy there, would you have an opinion as to the cause of the death? A. I would think that the strain was the contributory cause of his death.

A strain would cause the urinary tract to rupture somewhere, and this urine spilled out into the tissue would cause the toxemia and sepsis, the sepsis and death.

"Q. Doctor, have you ever heard of an ordinary case of gonorrhea without complication by a strain, resulting in death in three weeks or four weeks' time? A. I have practiced medicine for over thirty years, and confined my practice to venereal diseases for twenty-eight years, and I have never seen gonorrhea cause death except through the extravasation of the urine, which was caused by gonorrhea.

"Q. Did I understand you to say that extravasation of the urine there is caused from a strain? A. Yes, sir; if a man can't empty his bladder on account of a stricture * * *; so when the stricture which causes the obstruction of the flow of the urine a strain would very easily rupture a bladder, * * *.

"Q. Well, now, if he did have an infection down there, and is it possible for a strain to spread without any treatment; is it possible for a strain to spread that condition? A. Yes, sir. * * *"

And upon cross examination Dr. Wyman testified further:

"Q. Has anything in the history or in the findings, Doctor, in the chart, or autopsy there to show a stricture or rupture of the urethral tract? A. Yes, sir; the whole autopsy pictures the rupture of the urinary tract from a strain and not plain gonorrhea, * * *.

\* \* \* \* \*

"A. * * * One doctor testified when he first came in the hospital he could put his finger down in his groin. I have never seen that happen in gonorrhea.

\* \* \* \*

"A. It is my opinion that this man had a lot more than an ordinary case of gonorrhea.

\* \* \* \*

"A. I think a strain is contributory to the spread of gonorrhea from his urethra to the prostate.

\* \* \* \*

"A. \* \* \* Now, if a strain came along on top of a simple case of gonorrhea and tore or bruised or ruptured any of these tightened membranes that confined this germ, then it could spread.

"Q. To what extent would one have to strain himself to cause what you have assumed was the condition of this claimant here, the rupture? A. Mighty little. \* \* \*

"Q. Are you convinced that the extravasation of the urine was what caused that claimant's death?

\* \* \* \*

"A. That the extravasation of the urine is the cause, in my professional opinion, that the extravasation of the urine is the cause, primary cause of this man's death. The only thing; I'll go that far.

\* \* \* \*

"A. I'd like to make this statement. It is my professional opinion that this man could not have died of gonorrhea or its usual complications \* \* \*. This man had to have something extraordinary to have happened to him to cause this infection to spread outside of the genital tract into the surrounding tissue and finally throughout his whole body."

In reply to a subsequent question, Dr. Wyman testified: "And the strain would be the most likely reason for the genito-urinary tract to rupture. There would have to be something unusual, like a strain or something for the genito-urinary to rupture. The genito-urinary tract wouldn't rupture in the ordinary course of affairs, or life, I believe that a prostate with an extended bladder, and straining on a five or six hundred pound thing, taking a third of it, getting unbalanced like that, would throw a weight on it, and that strain could cause a leakage from that overextended bladder, if he had one, or leakage somewhere from his genito-urinary."

In view of the foregoing and other testimony, we cannot hold that there was no substantial evidence upon which the commission could base its findings, nor can we find adequate support for the contention of the appellants that the testimony of Dr. Wyman was without probative value. In 32 C. J. S., Evidence, § 569, Sub-section "c", page 396, we find the following:

"The opinions of physicians or medical experts may constitute substantial evidence, sufficient to support a finding, verdict, or judgment, but their credibility, and the weight of their testimony is for the jury or other trier of the facts. Ordinarily an opinion is not conclusive although uncontradicted, but within the rule considered in subdivision (a) of this section, *supra*, where the subject is one for experts or skilled witnesses alone and concerns a matter of science or specialized art or other matters of which a layman can have no knowledge, the unanimous opinion of medical experts on particular subjects may be conclusive, even if contradicted by law witnesses, although where uncontroverted medical opinions are merely deductions drawn from certain symptoms the final conclusion remains with the jury. A medical opinion cannot be arbitrarily disregarded, * * *. The jury must consider the testimony of a medical expert as a whole * * *. The fact that the witness was originally called to treat the party for the purpose of testifying, that he refreshes his recollection by reference to records, that he admits a possibility of error * * *, affects the weight of his testimony but does not destroy its probative force. * * * but the fact that all of the symptoms on which a physician bases his opinion are not proved does not render his entire opinion valueless."

A similar treatment of this question is found in 20 Am. Jur., paragraph 1206, page 1056: "Notwithstanding the critical comments upon the value and credibility of expert opinion testimony to be found in many opinions, it is generally recognized that the relative weight and sufficiency of expert and opinion testimony is peculiarly within the

province of the jury to decide, considering the ability and character of the witness, his actions upon the witness stand, the weight and process of the reasoning by which he has supported his opinion, his possible bias in favor of the side for whom he testifies, the fact that he is a paid witness, the relative opportunities for study or observation of the matters about which he testifies, and any other matters which serve to illuminate his statements. In other words, the same tests which are commonly applied in the evaluation of ordinary evidence are to be used in judging the weight and sufficiency of expert testimony. The opinion of the expert may not be arbitrarily rejected; it is to be considered by the jury in view of all the facts and circumstances in the case and of the common knowledge and experience of mankind; and when such common knowledge utterly fails, the expert opinion may be given controlling effect."

The facts of the instant case are not at all similar, in our opinion, to those which existed in the case of *Baker v. Graniteville Company,* 197 S. C., 21, 14 S. E. (2d), 367. In that case the claimant sought compensation on the ground that the decedent died from an accidental blow on his arm, arising out of and in the course of his employment. The evidence revealed that about two weeks before he received the blow, the decedent had received first aid treatment to his thumb and finger which were in a festered condition as a result of his having been gaffed by a fighting cock, as a result of which the decedent, prior to receiving the blow on his arm, had complained that it looked as if his arm might rot off. All of the physicians who had seen the deceased were of the opinion that the blow on the arm had nothing to do with the progressive development of the disease from which decedent was suffering and that it in no way accelerated or aggravated it. These physicians all testified that in order for a blow to have any provocative effect, it would, of necessity, have to produce such an injury as would cause a hemorrhage or hematoma underneath the surface of the skin in which blood or serum could

accumulate, that is, a black and blue spot, or bruise. There was a total absence of evidence showing or tending to show that there was a hematoma or bruise on the arm of the deceased in the area of the blow, or at any other point. In fact, there was positive testimony by the claimant and by her physician, that no such discoloration existed. Another physician, an expert witness who had not seen the decedent but who was given a history and description of the elbow injury, stated that if the blow caused a rupture on the arm, amounting to a hematoma, this area would constitute a good field in which the streptococcus germ would become active and produce a condition of erysipelas which disease was one of the conditions causing decedent's death. This physician agreed with the testimony of the other medical witnesses that the germ would have to enter the skin through an abrasion. However, as we have seen, the testimony of this expert was based on the condition of the decedent having sustained a rupture on the arm amounting to a hematoma, and, as we have seen, there was no such evidence in the case. This Court held in that case, as we now hold, that the weight and credit to be given the opinion of an expert witness, as expressed in his testimony, was a matter to be determined by the commission. But in that case the commission was held to be in error because there was no evidence in the case that the trauma suffered by the decedent was a factor in accelerating or aggravating the infection which was virulent in his blood stream when he received the blow. In that case the commission disregarded the expert testimony, and therefore there is no analogy between that case and the instant one.

It is true that the burden was upon the claimant to show the fact of the injury by competent testimony, which was done in this case, but it is not necessary that the evidence, in support of an award, negative all other possible causes of death. See *Jeffers v. Manetta Mills et al.*, 190 S. C., 435, 3 S. E. (2d), 489. In the case of *Rudd v. Fairforest Finishing Company et al.*, 189 S. C., 188, on page 191, 200 S. E., 727, on page 728, this Court used the follow-

ing language, and has subsequently adhered consistently to the principles enunciated therein:

"It is a familiar formula that findings of fact by a Board or Commission on a claim under a Workmen's Compensation Act are conclusive; and the appellate court will not review such findings except to determine whether there is any evidence to support the award. It may reverse an award if there is an absence of any evidence to support it, but it is not a trier of facts. If the facts proved are capable as a matter of law of sustaining the inferences of fact drawn from them by the Board, its findings are conclusive in the absence of fraud, and neither this Court nor the Court of Common Pleas is at liberty to interfere with them. This is but an application to Workmen's Compensation cases of the fundamental principle universal in Courts of law, that whether there is any competent evidence is for the Court to determine, but whether the evidence is sufficient is a qustion for the jury; the function of the Commission being in that respect that of a jury in actions of law."

Nor do we think that the findings of fact of the ██ single commissioner, which were upheld by the majority of the full commission, which, in turn, were affirmed by the Circuit Court, were founded on surmise, conjecture or speculation, as is contended by the appellants. We are of the opinion that the testimony which we have quoted, and to which no objection was made by the appellants at the hearing, together with other testimony in the case, was both relevant and competent. See *Westbury v. Heslep & Thomason Co.*, 199 S. C., 124, 18 S. E. (2d), 668. We do not think that the probative value of the testimony of Dr. Wyman was lost by reason of the fact that he had not actually seen the decedent, or by other factors attending his testimony. The Circuit judgment is therefore affirmed.

Judgment affirmed.

MESSRS. ASSOCIATE JUSTICES FISHBURNE and STUKES, and CIRCUIT JUDGES L. D. LIDE and E. H. HENDERSON, ACTING ASSOCIATE JUSTICES, concur.