16100

GREEN v. GRINNELL CO., INC. *ET AL.*
(48 S. E. (2d) 644)

*Messrs. Wise, Whaley & McCutchen,* of Columiba, for Appellant,

*Messrs. C. T. Graydon* and *John Grimball,* of Columbia, for Respondent,

July 7, 1948.

TAYLOR, J.: The respondent, G. E. Green, contends that he received an injury which arose out of and in the course of his employment with the Grinnell Company, Inc., at

their place of business in Charleston, South Carolina, on or about February 26, 1947. Said company was operating under the provisions of the Workmen's Compensation Act, Code 1942, § 7035-1 *et seq.*, with Employers Liability Assurance Corporation, Ltd., as its insurance carrier. After application was made for disability benefits under the Workmen's Compensation Act, the single Commissioner made an award in favor of claimant, which was sustained by the majority of the Commission. From such findings, the defendants appealed to the Court of Common Pleas for Richland County, which affirmed the award in its order dated November 24, 1947. It is from this order the defendants now appeal to this Court upon exceptions which pose the question of whether there is any evidence to sustain the findings of the Industrial Commission to the effect that plaintiff sustained an injury by accident arising out of and in the course of his employment, within the meaning of the Workmen's Compensation Act.

On or about February 26, 1947, claimant, along with two other employees of the defendant company, were loading three—or four-inch pipe onto a truck. After loading one of the pieces of pipe, claimant noticed a pain in the right leg, which caused him to shortly thereafter begin limping, so much so that it was noticed by the other two men. Claimant, thinking he had only sprained a muscle, waited approximately one week before going to Dr. Rhame, who gave him some sort of medicine for external application and told him to return if the trouble was not eliminated. Claimant, feeling better for a time, did not return immediately for treatment. By April 11, 1947, claimant testified that he realized his injury was something serious and would require further treatment. He therefore returned to his home in Columbia, South Carolina, where he consulted Dr. James T. Green, whose testimony in part appears as follows:

"Q. Just tell us, Doctor, what the history was that he gave you? A. On April 11th he came to see me and told

me that about six weeks prior to that time, while he was employed by the Grinnell Company and working in Charleston, South Carolina, he sustained an injury to the right leg. He was hauling four-inch pipe from the Charleston Linen Supply Company to the Stark General Hospital and transforming this pipe from the ground to the truck when he had this rather sudden pain in the right hip and buttocks. Then he told me that he had been to see Dr. Rhame. At the time he lost a half a day from work, but continued to work until just prior to the time he consulted me. The pain in the buttocks and the leg had continued and was increased by exercise, long walking, standing. Sleep had not been disturbed, although when he arose in the morning his leg was stiff and he had difficulty in walking on the right leg for the first few minutes. He had very little discomfort in the low part of the back and had no peculiar sensations in the right leg other than the pain.

"On examination, I found that the contour of the back was essentially normal; forward bending was limited to about sixty percent of normal; hyperextension and lateral bending essentially normal. Straightleg raising on the right side was positive and about forty-five degrees; a straightleg raising on the left side caused pain to be referred down the right leg. The rest of the examination was essentially negative. There was no great discomfort in the low part of his back on any maneuver or any application of pressure. X-rays were the most important and the most significant in the examination, at which time it was revealed that he had a congenital or developmental defect in the spine with some anterior slipping of the fourth lumbar vertebra on the sacrum. It was felt at that time that the thing had been of long standing and probably the exertion of lifting the heavy pipe from one place to another caused some additional slipping in the spine and some nerve root compression with resultant pain in the leg. I thought very likely the thing could be carried through on a conservative basis. It seemed

.to be relatively mild. So I had him remain in bed at home for a period of three weeks, but there was no improvement .in the situation. I notified the insurance carrier and suggested to them that I might put him in the hospital if they had no objections. I heard no objections from them, and had him hospitalized at the Columbia Hospital, where traction was applied, with fairly prompt relief in pain.

"A few days after the relief in pain I allowed him up and allowed him to return to his home, and, just on normal activity, he had recurrence of pain. The pain apparently had become more acute during the past few weeks. I rehospitalized him and re-applied traction to his leg, but still he continued to have pain, and this time it was severe enough to require an opiate for the relief.

"I have taken additional x-rays in the standing position and in the lying position and find no change in the position of the two vertebrae. The x-rays can be superimposed without any additional forward slipping.

"I believe that this man has a severe enough defect to require an operation to fuse that part of his spine. He has got a very definitely unstable spine, and I believe that before he gets complete relief he is going to have to have that portion of his spine fused.

"I have an x-ray if the Commissioner would like to see it. I will demonstrate it if you would like for me to do it.

"There is the defect across there (indicating on x-ray film), and the idea would be to go in with a bone graft. I think he's got nerve root compression right at this point where the nerve root comes out.

"Q. There is no other treatment now that you feel will give him any permanent relief except this operation? A. I am afraid that is the only thing that will give him relief. At times these things in young people will respond to conservative therapy, such as bed rest, to overcome the acute phase. The acute phase is usually accompanied by muscle

spasm that holds the thing rather rigid. With bed rest and traction the thing is frequently overcome and they go along in a reasonably normal manner for a long period of time before they have any further recurrence.

"Q. He has testified that he did get relief from the hospitalization and rest in bed, but that a little while after he got up and started his normal movements he suffered even greater pain. A. Yes, sir.

"Q. You have testified that this was a congenital condition; that he went along all right apparently, inasmuch as there is no record he had had any trouble prior to this time in February when he was lifting this pipe, but that lifting that pipe and having that strain what we call aggravated or caused that pre-existing condition to flare up to where it had become activated? A. That's correct. He gave a history that he had had no previous symptoms and thought he was perfectly normal in every way and was as strong as the average individual."

## "Cross Examination

"Q. Doctor, are you related to the claimant? A. No, sir. I had never seen the claimant prior to the time he came to see me.

"Q. Dr. Green, with this congential condition—A. (Interposing) You may call it congenital or developmental. We don't know exactly what it is, whether congenital or developmental.

"Commissioner Johnson: He was either born with it or it gradually developed during a period of time?

"The Witness: That's right.

"Q. With your description of it, that condition which he had could have been aggravated, as you just said, by any lifting? A. By any severe force, yes, violent force, I would say.

"Q. And it just happened to occur when he was lifting this particular piece of pipe? A. That's correct.

"Q. He could have been at home moving a bed or pushing an automobile or any other relatively similar work? A. I think that's correct.

"Q. Is he disabled at the present time? A. I would say he is totally disabled at the present time, yes, sir.

"Q. Do you or do you not think that condition of disability will continue until this fusion? A. I am inclined to believe that it will continue until he has something definite done for it so as to stabilize that unstable portion of his spine.

"Q. Should the fusion return him to normal? A. I would say essentially normal."

Claimant's testimony in part was:

"A. It was on the 26th of February, at the South Carolina Linen Supply Company, the place we were working. We were loading a truck to take material and our tools over to the Stark General Hospital. We were loading pipe on the truck, and there was myself and two other men picked up a piece of pipe three inches or larger. I don't know the exact size of the pipe. We laid the pipe down in the truck, and I had a pain in my right leg. I thought I had sprained a muscle or something in my leg. So I went to Dr. Rhame in Charleston, and he didn't tell me it was in my back, anything like that, so I just went on thinking it was in my leg, that it was a sprained muscle in my leg.

"I worked on several weeks after that and it got to bothering me so bad I had to knock off. I come home, and found out it was in my back.

"Q. When was it you stopped work? A. The 11th of April.

"Q. You haven't worked any since? A. No, sir. Dr. Green advised me not to.

"Q. You stopped work, you say, on account of the pain in your back? A. Yes, sir; and in my leg mostly. The doctor told me it was in my back. I always thought it was in

my leg, and he told me it was caused from the vertebra in my back.

"Q. Did you tell any one of these other two men when you got this pain in your leg; did you report it to them? A. They noticed me limping around and asked me why I was limping. I didn't just come out and tell them. That same day—I don't guess it was thirty minutes after it happened —they noticed me limping around and asked me why I was limping and I told them I thought I had sprained a muscle in my leg."

### "Cross Examination

"Q. You say you were helping lift a pipe when you felt this pain in your leg, or which you thought was in your leg? A. Yes, sir."

### "Re-direct Examination

"By Commissioner Johnson: Q. You went to Dr. Green first? A. Yes, sir.

"Q. And he told you not to go back to work, you weren't able to go back to work? A. Well, I told him I couldn't work, and he advised me not to try to push myself because it might make it worse.

"Q. Did he or not recommend an operation? A. Not at the time, no sir. He told me to try to avoid it at first and that's the reason it's been so long until I put in a claim.

"Q. What did you do after that? A. Well, Dr. Green put me to bed and put boards under my mattress, told me to lay flat on my back, that maybe that would help to straighten it out, you know, keep it from jumping out of place. Then he put me in the hospital and they put weights on my legs and he did everything he could to avoid an operation.

"Q. What is your condition today? A. Well, from Saturday a week ago up until Friday night I was having so much pain with it I couldn't walk, couldn't even stand up. I went to the hospital and they put weights on my legs

again and kept me on my back until Wednesday morning, from Saturday to Wednesday, and Wednesday I felt better and it seemed like the pain had left me a little bit, so I decided to go home and lay in bed a while and see how I felt. I stayed in bed until Sunday night. I knew I was going to have to go to the doctor Monday to take some more x-ray pictures, and I got up and walked around a little bit. It seemed like I felt better, and I have been walking since. It's just at times it bothers me more than it does at others."

## "Re-direct Examination

"By Commissioner Johnson: Q. How long did you stay in Charleston after you left Dr. Rhame? You went to Dr. Rhame in Charleston one time? A. Yes, sir.

"Q. How long did you stay after that? A. I don't know the exact date I went to the doctor, but I stayed until the 11th of April. I left Charleston the 11th of April to come home.

"Q. Was your leg bothering you enough to go to a doctor then? A. Yes, sir. I knew then that it must have been something serious, and if I was going to have to go to the hospital or anything I would rather be here at home.

"Q. That's when you made up your mind to come home to Columbia? A. Yes, sir. I thought it was in my leg; didn't have any idea it was in my back until Dr. Rhame told me."

## "Re-cross Examination

"Q. You felt the pain about the 26th of February, roughly? A. Yes, sir.

"Q. Then about a week later you went to Dr. Rhame? A. Something like that.

"Q. Then you stayed at Charleston a month or six weeks after that and didn't go back to see him? A. That's right."

In reviewing this case on appeal, this Court is of course cognizant of the well founded rule of law that the Industrial Commission being the fact finding-

body and this Court and the Circuit Court both being appellate Courts in workmen's compensation matters, this and the Circuit Courts can only review the facts to determine whether or not there is any competent evidence to support the findings of the fact-finding body. If there is, the Courts are without power to pass upon the force and effect of such evidence. An award may of course be reversed if there is an absence of any competent evidence to support it, but in Workmen's Compensation cases the Courts are not the triers of facts. If the facts proved are capable as a matter of law of sustaining the inferences of fact drawn from them by the Industrial Commission its findings are conclusive in the absence of fraud and neither this Court nor the Court of Common Pleas is at liberty to interfere with them. *Anderson v. Campbell Tile Co.,* 202 S. C. 54, 24 S. E. (2d) 104; *Crawford et al. v. Town of Winnsboro et al.,* 205 S. C. 72, 30 S. E. (2d) 841; *Lanford v. Clinton Cotton Mills,* 204 S. C. 423, 30 S. E. (2d) 36; *Strawhorn v. J. A. Chapman Const. Co.,* 202 S. C. 43, 24 S. E. (2d) 116: *Cokeley v. Robert Lee, Inc.,* 197 S. C. 157, 14 S. E. (2d) 889; *Shehane v. Springs Cotton Mills,* 206 S. C. 334, 34 S. E. (2d) 180.

This court has quoted rather extensively from the testimony in order to show its application to the well-known principle of law cited above. We are of the opinion that the evidence is sufficient to support the findings and award of the Industrial Commission; hence, the exceptions are overruled and the judgment affirmed.

BAKER, C.J., and FISHBURNE, STUKES and OXNER, JJ., concur.