. 16606

HIERS v. BRUNSON CONST. CO., *ET. AL.*

(70 S. E. (2d) 211)

*Messrs. Wise, Whaley & McCutchen,* of Columbia, *for Appellants,* cite:

*Messrs. Blatt & Fales,* of Barnwell, *for Respondent,* cite:

March 26, 1952.
TAYLOR, Justice.

This is a workmen's compensation case. Mrs. Olive Hiers, the respondent herein, is the dependent widow of Hubert J. Hiers, who, it is contended, died March 8, 1950, as a result of an accident which arose out of and in the course of his employment with the Brunson Construction Company, who together with its insurance carrier, Employers Mutual Liability Insurance Company, are appellants.

Application was duly made to the South Carolina Industrial Commission for death benefits under the Workmen's Compensation Law, Code 1942, § 7035-1 *et seq.* Appellants entered an appearance and denied liability on the grounds that death did not result from an injury by accident arising out of and in the course of his employment within the contemplation of the Workmen's Compensation Law. After several hearings, the Hearing Commissioner issued his opinion and award in favor of respondent for benefits in the amount of $6,000.00 and medical benefits. Application was made to the whole commission for a review who, by its opinion dated April 25, 1951, affirmed the findings and award of the Hearing Commissioner. Appeal was duly taken to the Court of Common Pleas for Saluda County upon the same grounds as listed in the application for review. The Honorable T. B. Greneker heard the matter on appeal and filed his order, dated July 7, 1951, overruling all exceptions and affirming the award of the Industrial Commission.

Appellants now come to this Court contending that there was no evidence of probative value upon which the Industrial Commission could conclude that death was the result of an injury by accident which arose out of and in the course of the employment.

To determine this question it becomes necessary for this Court to review the evidence, but it is well established that the Industrial Commission is the fact-finding body and this Court and the Circuit Court both being appellate courts in Workmen's compensation matters can only review the facts to determine whether or not there is

any competent evidence to support the findings of the fact-finding body. If there is, the Courts are without power to pass upon the force and effect of such evidence. An award may of course be reversed if there is an absence of any competent evidence to support it, but in workmen's compensation cases the Courts are not the triers of facts. If the facts proved are capable, as a matter of law, of sustaining the inference of fact drawn from them by the Industrial Commission, its findings are conclusive in the absence of fraud and neither this Court nor the Court of Common Pleas is at liberty to interfere with them. *Anderson v. Campbell Tile Co.*, 202 S. C. 54, 24 S. E. (2d) 104; *Crawford v. Town of Winnsboro*, 205 S. C. 72, 30 S. E. (2d) 841; *Lanford v. Clinton Cotton Mills*, 204 S. C. 423, 30 S. E. (2d) 36; *Strawhorn v. J. A. Chapman Const. Co.*, 202 S. C. 43, 24 S. E. (2d) 116; *Cokeley v. Robert Lee, Inc.*, 197 S. C. 157, 14 S. E. (2d) 889; *Shehane v. Springs Cotton Mills*, 206 S. C. 334, 34 S. E. (2d) 180; *Green v. Grinnell Co.*, 213 S. C. 116, 48 S. E. (2d) 644; *White v. Carolina Light & Power Co.*, 215 S. C. 25, 53 S. E., (2d) 872; *Buff v. Columbia Baking Co.*, 215 S. C. 41, 53 S. E. (2d) 879; *Schrader v. Monarch Mills*, 215 S. C. 357, 55 S. E. (2d) 285; *Teigue v. Appleton Company, S. C.*, 68 S. E. (2d) 878.

Mrs. Hiers, the respondent herein, testified that the deceased was working as a carpenter for the Brunson Construction Company at the time he became ill, that he worked from job to job as the Superintendent for the Brunson Construction Company as directed, that on February 19, 1950, he visited the doctor because he had a cold and suffered from nervousness. On the following day, February 20th, he was taken to the hospital and remained therein from that time, which was Monday, until the following Saturday when he was discharged from the hospital and returned home but remained in bed. He did not improve, however, and returned to the hospital where he developed pneumonia and died March 8, 1950.

Mr. I. S. Garris testified that he boarded with Mr. Hiers while living at Smoak, South Carolina, and that Mr. Hiers worked wherever he was sent by Mr. Brunson of the Brunson Construction Company, that on February 20th, a cold, raw, rainy day he went with Mr. Hiers to Ridge Spring, South Carolina, where they were constructing a health center, that a leak had developed in the roof which was damaging the plaster, that he and Mr. Hiers repaired the roof in order to stop the leak, the time required to complete the operation being approximately 45 minutes. During that afternoon Mr. Hiers suffered what was in his opinion a chill, whereupon he carried him to Walterboro, South Carolina, where he was admitted to the hospital by a doctor there. The death certificate which was part of the record stated that the deceased employee died on March 9, 1950, that his usual occupation was contractor (Superintendent of Brunson Construction Company) and that the cause of his death was "a typical pneumonia-pleurisy", and that the interval between onset and death was ten days.

Dr. H. A. Gross testified that he had been a general practitioner for twenty-one years and during that time had on numerous occasions had experience with the cause and treatment of pneumonia. Dr. Gross stated in his opinion, that if a man had a cold, got wet and physically exerted himself it would substantially contribute and cause the influenza, double pneumonia and pleurisy. He stated that it was his opinion, that the conditions to which the deceased employee was subjected caused the pneumonia which the death certificate said he had; that, because this man had a cold and fever he died from going to work. That he was basing his opinion on the facts that the deceased had a cold, was subjected to cold weather, wet weather, over-exertion, which are predisposing causes of pneumonia.

Dr. L. A. Hartzog testified that he had been engaged in the practice of medicine for forty-one years; that he had during those forty odd years had occasions to come in contact with the cause and treatment of pneumonia. In his opinion,

Dr. Hartzog stated, if a person had a head cold and worked in the rain, getting wet and exerting himself physically, then started having chills and high fever, these things would substantially contribute to and cause the influenza, pneumonia and pleurisy which would cause death, and most probably in this case did. That if the deceased had not gotten wet and chilled and exerted himself, and had stayed at home by a fire or in bed he would not have had pneumonia and would probably be living.

Dr. Bruce Edgerton testified that he practiced medicine in Blackville, South Carolina, and had been doing so for seven years, during which time he had had various experiences of the cause and treatment of pneumonia. Dr. Edgerton stated that if a person who had a head cold worked on the roof of a building in the rain, got wet and during the early afternoon of the same day performed exerting physical work. then began having chills and high fever and was taken from his job to a hospital one hundred miles away with a virus infection and a bad case of influenza, stayed there five days being at home for three days thereafter, and returned again to the hospital and died eight days later with double pneumonia and pleurisy, that in his opinion, the fact of having a cold, getting wet and physically exerting himself, substantially contributed to and caused the pneumonia and pleurisy which resulted in death. That it was his opinion, that the deceased probably would not have contracted pneumonia if he had stayed in bed. That if he had not gotten wet and had not exerted himself he would not have had the pneumonia.

John Langley testified that he lived in Allendale, South Carolina, and was a painter. That he worked for Brunson Construction Company and was working at Ridge Spring on Monday, February 20, 1950. That Mr. Hiers picked him up on the truck in Allendale that morning about 8:00 and they reached Ridge Spring about 9:30 o'clock. That they unloaded the truck first thing containing doors, windows, etc. Langley stated that it was a cold day and began raining

during the morning, and that he had put the ladder up for Mr. Hiers to go on top of the roof. The witness further testified that Mr. Hiers told him later on in the afternoon, about four-thirty or five o'clock, that he had turned the work over to another man because he was sick and had to go to the hospital. The testimony of Langley further reveals that the deceased-employee had helped hang doors during the day.

Miles Taylor testified that he was a painter and worked for Brunson Company. That on February 20, 1950, he was working at Ridge Spring. That the truck had picked him up that morning and Mr. Hiers was on this truck in the cab with Mr. Garris. The witness stated that he worked on the inside of the building and that Mr. Hiers worked on the roof during the day trying to stop a leak, and that he had seen John Langley put the ladder up for him. Taylor stated that he did not see Mr. Hiers any more that day until about five o'clock when they were getting in the truck, at which time Mr. Hiers stated that he was going to the hospital because he was sick.

G. W. Smith testified that he was a paint contractor and on Monday, February 20, 1950, he worked at Ridge Spring. That Mr. Hiers picked him up at Hampton in the truck and that it being such a very cold morning he had put blankets on top of himself to keep his feet and hands warm while traveling to work. That when they reached Ridge Spring they unloaded the truck and that he began painting the cabinets in the back of the building and did not go out any more until dinner time, at which time he noticed that it was raining. He then went back into the building and did not go out again until night time.

J. H. Chassereau testified that he worked for Brunson Construction Company and in February, 1950, had worked on the Ridge Spring job as a carpenter. That he worked inside the building and only saw Mr. Hiers at the warehouse that morning, at which time Mr. Hiers appeared to be sick. That the deceased went to the shack and stayed until about

twelve-thirty o'clock, and at this time he came where they were and asked if they had eaten dinner; that after stating they had not eaten, he asked them to send him a cup of soup which they did, but that he did not drink it, but went back to the shack and lay down where he stayed until about four o'clock and then asked his brother-in-law to take him to the hospital. The witness stated further that it did not rain on the day in question but started raining on Wednesday of that week.

Norman Drawdy testified that in the early part of 1950 he worked for Brunson and Varn Roofing Works and that he was working on the Ridge Spring job with Mr. Hiers. Drawdy stated that he went on the roof to repair it and Mr. Hiers did not go on the roof with him, nor did anyone else. That he saw Mr. Hiers around and about the building during the day but did not see him on the roof. The witness stated further that it might have rained during the afternoon of the day in question, but it was not raining while he was on the roof.

J. M. Varn testified that he was engaged in the roofing business and was so engaged in February, 1950. That the firm of Varn and Brunson had no connection with the Brunson Construction Company. The firm of Varn and Brunson roofed the Ridge Spring Health Center building and the Brunson Construction Company did not do any of the roofing work on this building. He stated further that Mr. Hiers did not have any cause to be on the roof. Also, that when his men weren't busy they worked for Brunson Construction Company sometimes, and would then be under Mr. Hiers' supervision.

H. C. Brunson testified that he operated the Brunson Construction Company but was not on the Ridge Spring job at any time on February 20, 1950. That the deceased employee was an employee of Brunson Construction on that date as superintendent, and it was not part of his duties to make repairs himself. That Brunson Construction Company

did not have any connection with the placing or repairing of the roof on the Ridge Spring Health Center job. Mr. Brunson stated that on Saturday morning before the day in question, February 20, 1950, he had seen the deceased, and that he, the deceased, borrowed money from him to go to the doctor and then to the hospital if necessary because he was not well and had a bad cold. Further, that he saw the deceased at the hospital but that the deceased made no statement concerning February 20th.

The appellants at this hearing had the report of Riddick Ackerman, Sr., M. D., and said report was agreed to be made part of the record by counsel for the claimant.

The report is as follows:

"To whom it may concern:

"This is to certify that Hubert Hiers came to me for attention February 19, 1950 at which time he was very nervous, had a blood pressure of 200-120 with some cardiac strain, passive congestion of the liver and mild virus infection. He had been drinking some and it was apparent at the time that this could cause the brunt of his disability. He was advised to go to the hospital but declined on account of his business affairs.

"He was admitted to the Colleton County Hospital February 20, 1950 with similar symptoms when his condition was weighed more seriously because of his unsatisfactory response to treatment. Under active treatment for his circulation and depletion of his congested liver, he did fairly well until his discharge February 25, 1950, though his condition was still not satisfactory and he was so advised.

"On February 28, 1950 he returned to the hospital with symptoms of increased cold and further aggravation of the cardio-vascular symptoms but was apparently responding fairly well until the early morning of March 3, 1950 when he developed an acute pleurisy with pneumonia when x-ray showed an involvement of both lungs. From then on it was difficult to sustain his circulation and respiration and at

9:45 p. m. on March 8, 1950 he sustained a sudden cardiac collapse and died within a few minutes.

"Mr. Hiers was advised to go to the hospital on February 19, 1950 and he gave no history of any unusual exposure or exertion. It is my candid opinion that his disability and death were caused by virus infection and preexisting cardiovascular disease."

The following hypothetical questions were asked Dr. Izard Josey by counsel for the appellants and he gave the following answers:

"Q. Doctor, I want to ask you a hypothetical question as follows: If a man in the neighborhood of forty-seven years of age engaged in construction work as foreman and general construction work, goes to work on a February day, when it is probably cold early in the morning, and he is complaining of a cold or head cold, and he hangs around a bunk house practically all day, perhaps doing a little work, but not much, he orders soup for dinner to be brought to him but does not eat it, around four or five o'clock that afternoon apparently has a chill or fever. Then he rides about one hundred miles to a hospital. He enters the hospital, remains there for five to six days, is dismissed and returns to his home for approximately three days and re-enters the hospital and then dies in approximately eight days later, without there being any evidence of trauma or a noticeable physical injury, what would be your professional opinion as to the effects, if any, of his employment bearing on his death? A. I wouldn't be able to see where his employment had anything to do with his death.

"Q. Doctor, I would like to ask another hypothetical question. If a man approximately forty-seven years of age, engaged in construction work as a foreman or a construction worker, goes to work on an early February day, probably cold at the time, is complaining of a cold or head cold, and goes to the roof of a building to repair a leak, stays there thirty minutes to an hour, getting wet, then he later engages on that day in work inside of a building hanging doors;

and about four or five o'clock that afternoon has what is apparently a chill or fever and is driven one hundred miles to a hospital, where he remains under treatment for five or six days, is then discharged and remains out of the hospital for three or four days, then he re-enters the hospital and apparently responds well to the treatment until three days later when he develops an acute involvement of both lungs, and about five days later dies, there being no evidence during any of this period of a trauma or physical injury, what would be your professional opinion as to the relationship, if any, between his employment and death? A. I wouldn't be able to see any relationship between the employment and death, sir.

"Q. I have one other hypothetical question to ask you. If a man in the neighborhood of forty-seven, engaged as a construction worker, is medically examined and found to be very nervous, with blood pressure 200/120, having some cardiac strain, passive congestion of the liver and mild virus infection, is advised to enter the hospital but refuses, then goes to work on the following day climbs on the roof of an ordinary building and gets wet in the rain while repairing a leak for about forty-five minutes, and then later works inside the building hanging doors, and subsequently that day is driven one hundred miles and enters the hospital with similar symptoms as found on the previous day, and remains in the hospital for five or six days under treatment, does fairly well, and is discharged to return home although his condition is not altogether satisfactory, but three or four days later re-enters the hospital with symptoms of increased cold and further aggravation of the cardio-vascular symptoms, apparently responds very well to treatment until three days later developed an acute involvement of both lungs, from which time it was difficult to sustain circulation and respiration and dies five days later after a sudden cardiac collapse, there being no evidence of trauma or physical injury, what in your professional opinion was the relationship

between the employment and his death? A. I cannot relate the employment to his death in that instance."

Counsel for the appellants asked the witness the following additional question and Dr. Josey answered the following accordingly, but counsel for the claimant objected to same, on the ground that it was inadmissible.

"Q. Doctor, at my request, have you examined the hospital records of the Walterboro or Colleton County Hospital with respect to the stay and treatment of Hubert J. Hiers in that hospital from on or about February 20th to on or about February 25th or 26th and then from February 28th until the time of his death at the hospital? A. Yes, I have and along with that Doctor Ackerman's notes."

The witness stated that the records in discussion were made by the hospital and not by a doctor; that they were made from the temperature charts, nurses' records and things like that. Counsel for the claimant objected because they had not been properly identified.

The Commissioner then let Dr. Josey testify subject to counsel for the claimant's objection.

Dr. Josey stated that based on his review of Dr. Ackerman's findings and the hospital records of Mr. Hubert J. Hiers' admission to the hospital, to the Colleton County Hospital on February 20th through February 25, 1950, and February 28th to the time of his death on the 8th of March, 1950, and including an $x$-ray examination of his chest made on the 4th of March, 1950, which was also part of the hospital records, it was his opinion, that Mr. Hiers had heart disease caused by high blood pressure and coronary artery disease. That he had congestive heart failure when first seen on the 19th of February and that was prior to his admission to the Colleton County Hospital the first time. That the course of his disease was that of cardiac failure with the probability of some mild respiratory infection. That his death was not due to respiratory infection of any nature, either of virus or bacteria pneumonia, but was due to heart failure,

congestion of his lungs, atelectasis of his left lung with the most likely last happening or point of exodus being a pulmonary infection rather than pneumonia; that his temperature chart as was shown by the hospital records from the 20th to the 23rd of February was not that of pneumonia, normal temperature during that time. Further, that the deceased-employee's temperature remained normal after being re-entered to the hospital on the 28th of February until the 4th of March at which time he had the atelectasis of his lung and later died. That the respiratory condition was not the cause of his death, that it was heart failure with complications that occur with heart failure. It was his opinion, that the claimant suffered no accident or injury as far as he had been able to hear.

All of the testimony of Dr. Josey was subject to objections by counsel for the claimant.

Dr. J. William Pitts testified in a similar vein substantiating that of Dr. Josey in practically every respect and stated that, in his opinion, the deceased died of congestive heart failure.

At the fourth hearing in this case at Barnwell, South Carolina, on January 15, 1951 counsel for the claimant made the following statement: "* * * that if the superintendent of the hospital was present that he or she would testify that the original records referred to were the official record of the hospital pertaining to the illness and death of Mr. H. J. Hiers. I have no objection to having that go in. I do not admit the truth of this record and do not withdraw any of my objections made at the previous hearing."

Dr. H. E. Gross was asked the following hypothetical question to which he answered the following by counsel for the claimant:

"Q. Doctor Gross, I want to ask you this question. Take a man between forty and fifty years of age, who on February 19, 1950, was very nervous with blood pressure of 200/120

and with some cardiac strain, passive congestion of the liver and mild virus infection, had been drinking some, and on the following day, February 20, 1950, rode a distance of about seventy to one hundred miles in a truck in cold weather to go on a construction job, of which he was superintendent and while in the performance of his duties, went upon the roof of a building in the rain and attempted to stop leaks on this building where he worked for a period of thirty to forty-five minutes, the weather still being cold and rainy, and then came down off the building and helped hang doors inside the building until between four and five o'clock that afternoon, ordered some soup for dinner which he didn't eat, and then between the hours of four and five and there-abouts had had chills and fever, and left the job around five o'clock that afternoon and rode in an automobile a distance of a little more than one hundred miles to a hospital at Walterboro where somewhat similar symptoms were found to exist that existed on February 19th and was treated for circulation and depletion of his congested liver and was discharged on February 25, 1950, and he went to his home where he stayed in bed until February 28, 1950, at which time he returned to the hospital with symptoms of increased cold and aggravation of the cardio-vascular system, and apparently he responded fairly well until the early morning of March 3, 1950 when he developed an acute pleurisy with pneumonia and found to have involvement of both lungs with some difficulty to sustain his circulation and respiration, and at nine forty-five p. m. on March 8, 1950, he sustained a sudden cardiac collapse and dies within a few minutes, with no evidence of physical injury or trauma, in your medical opinion state whether or not the work he was doing in the rain and cold on February 20, 1950, contributed to or was in any wise responsible for his death? A. I do. I think it contributed to it.

"Q. Is that condition that I have described to you with reference to his cardiac trouble, did this work he was doing

and that which followed aggravate the pre-existing condition? A. Yes, sir."

On cross examination Dr. Gross stated that he did not know the cause of the deceased employee's death; but, it was his opinion, that the deceased employee's work on February 20, 1950 contributed to his death whether from pneumonia or cardiac; that all the symptoms that the deceased had are symptoms of pneumonia process.

The same hypothetical questions were asked Dr. L. A. Hartzog and he corroborated the testimony of Dr. Gross.

It will be observed that much of the testimony including the expert testimony is contradictory. The sufficiency and weight thereof therefore becomes a question to be determined by the fact-finding body. It cannot be said by this Court that the testimony of those witnesses to the effect that it was raining and necessary to repair the roof in order to protect the building, that it was a "raw, cold day," that shortly thereafter the deceased became ill and that the expert medical testimony to the effect that such conditions were conducive to bringing about or accelerating a pneumonia condition and accelerated or caused the death of Mr. Hiers, was without probative value. A similar situation arose in regard to expert medical testimony in *Smith v. Southern Builders,* 202 S. C. 88, 24 S. E. (2d) 109, 114, which was a heat prostration case where all of the medical testimony with the exception of that of one doctor was to the effect that the deceased died not of heat prostration but of a heart attack. The Circuit Judge reversed the award of the Industrial Commission on the grounds that the only reasonable inference to be drawn from the evidence was that the deceased suffered a heart attack. This Court reversed the order of the Circuit Court and said that "It was for the Industrial Commission to determine which diagnosis advanced by these physicians it would accept", and that the case of *Hickman v. Ætna Life Insurance Company,* 166 S. C. 316, 164 S. E. 878 where

it was held that there "are circumstances in which the expert opinion of a physician has no probative value," had no application thereto.

But as stated in *Etters v. Equitable Life Assurance Society*, 175 S. C. 142, 178 S. E. 610, 611, "The Court has not held in any opinions brought to our attention that the opinions of doctors in such cases have no probative value." After such expert testimony is admitted, it is to be considered by the fact-finding body just as other evidence and given such weight as in the opinion of such body it should receive. *O'Kelley v. Mutual Life Insurance Company*, 197 S. C. 109, 14 S. E. (2d) 582. The probative value of expert testimony passing upon hypothetical facts stands or fall with the existence of the facts upon which it is predicated, and the Circuit Court fell into error when it attempted to weight the testimony.

This Court has not heretofore been called upon to pass upon a case where death from pneumonia was termed an accident within the terms of the Workmen's Compensation Act. The general rule is that injuries resulting from exposure to conditions due to the weather or natural elements, such as heat, cold, ice, snow or lightning, are generally classed as risks to which the general public is exposed and as not coming within the purview of the Workmen's Compensation Act, although the injured person at the time he receives his injury may have been discharging duties incident to and in the course of his employment. There are many cases, however, that are controlled by well recognized exceptions to this rule where the employment of the injured person requires him to be at the place where his injury is received, and he is in fact in such place in pursuance of the discharge of his duties of his employment, the risk thereby encountered is held to be incident to such employment, though the injury may have resulted from conditions produced by the weather to which persons generally in the locality were exposed. While the conditions produced by the weather may in a sense affect

all alike in the particular vicinity, yet the fact remains that a person so employed is much more exposed to such hazards than the public generally, because of the duties enjoined upon him by his employment, and the place or places which such duties require him to be. The test as to whether the injury or death arose out of or in the course of employment when caused or hastened by atmospheric conditions, is whether, under all the circumstances, the employee was exposed to a greater risk by reason of his employment and duties than was imposed upon an ordinary member of the public. *Central Illinois Public Service Company v. Industrial Commission*, 291 Ill. 256, 126 N. E. 144, 13 A. L. R. 967 *et seq.*

The adjective "accidental" qualifies and describes the injuries contemplated by the statute as having the quality or condition of happening or coming by chance or without design, taking place unexpectedly or unintentionally. If one becomes ill while at work from natural causes, the state or condition is not accidental since it is a natural result or consequence and might be termed normal and to be expected. If, however, there is a subsisting condition of illness or incapacity or physical disability which is caused, increased, or accelerated by some act or event coming by chance or happening fortuitously, then the requisite quality or condition of the injury will exist so as to make it accidental. Neither is it necessary that the accidental quality or condition be created by wound or external violence. *Geipe v. Collett*, 172 Md. 165, 190 A. 836, 109 A. L. R. 887.

Benefits were allowed in *Jones v. Philadephia & R. Coal & I. Co.*, 285 Pa. 317, 132 A. 122, for death from pneumonia caused by unusual exertion and exposure to cold weather in connection with the use of a large quantity of water in the course of his employment outdoors.

"The term 'injury' as used in the phrases 'personal injury or death accidentally sustained', 'injury by accident', 'injury proximately caused by accident', and similar expressions, has been construed to mean not only an injury the

means or cause of· which is an accident, but also an injury which is itself an accident; that is, an injury occurring unexpectedly from the operation of internal or subjective conditions, without the prior occurrence of any external event of an accidental character. As stated in some cases, an injury, to be accidental, need not have been created by wound or external violence." 58 Am. Jur., Sec. 195, pp. 704, 705.

In *Tweten v. N. D. Workmen's Compensation Bureau,* 69 N. D. 369, 287 N. W. 304, it was held that underlying structural weakness is not a pre-existing disease. See also Horovitz on Workmen's Compensation, p. 285. In *McPhee's Case,* 222 Mass. 1, 109 N. E. 633, an employee while helping put out employer's fire became wet and developed pneumonia and this was held to be within the terms of the Workmen's Compensation Act. See also Current Trends in Workmen's Compensation, p. 484, by Horovitz. See also Workmen's Compensation, Injury or Death Due to Elements, 83 A. L. R. 234, *et seq.*

In the majority of jurisdictions, no slip, fall or other fortuitous event or accident in the cause of the injury is required; the unexpected result or industrial injury is itself considered the compensable accident. See footnote, Schneider's Workmen's Compensation, Perm. Ed. 1945, Vol. 4, 385, which lists the following states as subscribing to the above: Ark., Colo., Conn., Ga., Idaho, Ill., Ind., Me., N. H., N. J., N. M., N. Y., Ohio, Okla., S. C., S. D., Tenn., Va., Wis., Wyo.

The exposure and chill suffered by deceased was greatly in excess of that suffered by his fellow employees or the public generally as he was on top of a building where he was fair target for the cold rain and wind. Such conditions are calculated to chill and wet one more than being on the ground or about the building generally.

In 5 Schneider's Workmen's Compensation, p. 96, it is stated:

" '* * * the exposure and chill which he suffered was greatly and materially in excess of that to which people not similarly employed in said locality were exposed. * * * Although a germ disease, the trial court found in the instant case that pneumonia was caused by the chill and wet from exposure peculiar to the time and place of employment. * * * How could it be said that the shock from a chilly air and cold water as contrasted with August temperature on the outside were such as to cause pneumonia but no injury to the physical structure of the body? To so declare would in effect mean that such injury is limited to external traumatic injuries. This would be wholly illogical and at variance with our former views * * *' ".

Where the work and the method of doing the work exposes the employee to the forces of nature to a greater extent than he would be if not so engaged, the industry increases the danger from such forces, and the employer is liable. 1 Honnold's Workmen's Compensation, p. 428, Sec. 119.

"Without pursuing the review, it is clear enough that this Court in *Gulf State Steel Co. v. Christison,* 228 Ala. 622, 154 So. 565, followed the line of cases, English and American holding injury or death resulting from an exposure to the forces of nature, peculiar to the nature, time and place of the employment, is an accidental injury arising out of and in the course of employment. The spirit and purpose of Compensation Laws, as often disclosed, is that industry shall bear part of the burden of disability and death resulting from the hazards of industry.

"We can discern no difference in principle between injury resulting from exposure to excess of heat and humidity, and exposure to cold and water. If the chill and shock is found to so disturb the bodily structure as to result in pneumonia and death, there can be no distinction in principle between this and pneumonia brought on by external wounds." *Pow v. Southern Constr. Co.,* 235 Ala. 580, 180 So. 288. See Notes in 73 A. L. A. 539 *et seq.;* 20 A. L. R. 66 *et seq.*

" ' "The rule is that, when the employment brings a greater exposure than that to which persons generally in that locality are exposed, injury or death resulting therefrom, such injury or death does arise out of the employment." * * * It is not denied that the building where decedent was working was damp. It was colder than outside: how much colder is in dispute, but unquestionably it was colder. Persons generally in that locality were not exposed to that lower temperature nor to the increased dampness prevailing within the concrete wall of this unheated building. *The fact that others did on occasion work in the same place and that on the day in question another workman accompanied the decedent makes no difference. It is not necessary that one should be alone exposed or that all others similarly exposed should sustain the same effect. Conditions of general health and natural resistance enter into the matter.*' " Schneider's Workmen's Compensation, Perm. Ed. 1945, Vol. 5, p. 320. (Emphasis ours.)

The case of *Smith v. Southern Builders, supra,* while a heat prostration case, is of considerable aid here, as the reasoning used therein is equally applicable to the facts of the instant case, as will be seen from the following:

"Although the authorities on this subject are not uniform, we think the following conclusions by Judge Parker of the Court of Appeals of the Fourth Circuit in the case of *Baltimore & Ohio Railway Company v. Clark,* 59 F. (2d) 595, 597, after an able and exhaustive review of the cases, are in accord with the weight of authority and are sound in principle:

" 'A workman who sustains heat prostration as the result of the working conditions under which he labors, has sustained an injury "arising out of and in the course of his employment"; and the fact that other workmen may not have been affected or that he may have been rendered more readily susceptible to injury than they were by reason of his physical condition cannot affect the matter. * * * The question as to whether heat stroke is to be deemed

an accidental injury within the meaning of workmen's compensation acts has been frequently before the courts. In some cases distinction is made between injuries caused by natural and those caused by artificial heat; and in a few it is said that the injury must be caused by some unusual or extraordinary condition. The rule supported by the weight of authority, however, is that heat prostration which results from the employee's engaging in the employment, whether due to unusual or extraordinary condition or not, is to be deemed an accidental injury within the meaning of the statutes. * * * Such an injury is accidental in that it is unforeseen and unexpected. If it results from the conditions under which the work is carried on, there is no reason why it should not be held compensable. In such case, it is one of the casualties of the business; and it is the purpose of the compensation statutes to place the burden of such casualties upon the business and not upon the unfortunate employee.' "

Appellants further contend that Varn & Brunson Roofing Company roofed the building in question and that this concern had no connection with Brunson Construction Company and that Mr. Hiers deviated from his duties as superintendent when he went upon the roof to make needed repairs. There is testimony, however, that H. C. Brunson, owner and operator of Brunson Construction Company, is a partner in Varn & Brunson Roofing Company, that Mr. Drawdy, an employee of Varn & Brunson, was on the job that day and working under the directions of Mr. Hiers. A leak was apparent and damage was being done to the employer's property and he in the emergency was acting in his master's interest.

"An accident cannot be said not to 'arise out of' the employment merely because the injured employee at the time was not engaged in doing what was specially prescribed to him; but if in the course of his employment an emergency arises and, without deserting his employment, he does what he thinks necessary for the purpose of advancing the work

in which he is engaged in the interest of his employer, and in so doing he suffers injury, the accident may properly be regarded as arising out of the employment. An employee does not go outside his employment if, when confronted with a sudden emergency, he steps beyond his regularly designated duties in an attempt to * * * save his employer's property." 58 Am. Jur. 764. See *Jordan v. Dixie Chevrolet, Inc.,* 218 S. C. 73, 61 S. E. (2d) 654, 657; *Pelfrey v. Oconee County,* 207 S. C. 433, 36 S. E. (2d) 297.

Appellant relies to a great extent upon the North Carolina case of *Slade v. Willis Hosiery Mills,* 209 N. C. 823, 184 S. E. 844 and the cases cited therein. This Court, however, has expressly refused to follow the line of reasoning employed therein in the case of *Layton v. Hammond-Brown-Jennings Co.,* 190 S. C. 425, 3 S. E. (2d) 492, 496, in the following language:

"While the *Slade case (Slade v. Willis Hosiery Mills,* 209 N. C. 823, 184 S. E. 844) was decided April 8, 1936, approximately one year prior to the amendment of the South Carolina Workmen's Compensation Act, yet as has hereinbefore been pointed out, the amendment did not relate to the subsections under discussion, and therefore the presumption dose not arise that the South Carolina Legislature was adopting the construction and interpretation of the North Carolina Act as construed and interpreted in the *Slade case.*

"Even so, we have such respect for the North Carolina Court and its Chief Justice, the author of the *Slade opinion,* that we consider the holding therein as highly persuasive and entitled to great weight, but find that we are circumscribed by the rule as stated by our own Court in *Goethe v. New York Life Ins. Co.,* 183 S. C. 199, 217, 190 S. E. 451, 458, as follows: 'The rule clearly deducible from the overwhelming weight of authority is that, when injury or death follows or results from a voluntary act of the insured, and the act is one which is not manifestly dangerous, but which is ordinarily done or performed without serious con-

sequences to the doer, such result is caused by accidental means. This is nowhere better stated than by Sanborn, J., in *Western Commercial Travelers' Asso. v. Smith,* [8 Cir.,] 85 F. 401, 405, 29 C. C. A. 223, 56 U. S. App. 393, 40 L. R. A., 653, where he says: "An effect which does not ordinarily follow and cannot be reasonably anticipated from the use of those means, an effect which the actor did not intend to produce and * * * cannot be charged with the design of producing, * * * is produced by accidental means." '

"The words 'by accident', and 'an accident', as used in the Act, and the words 'accidental means', as used in insurance policies are, it seems to us, synonymous."

Appellants introduced into the record climatological data for South Carolina for the month of February, 1950, as conclusive evidence that there was no rain on the day in question. This, however, as other evidence, became a question of fact for determination by the Industrial Commission.

For the foregoing reasons, we are of the opinion that there is ample evidence to support the findings and award of the Industrial Commission and that the order appealed from should be affirmed, and it is so ordered.

BAKER, C. J., and FISHBURNE, STUKES, and OXNER, JJ., concur.